```
 1                   UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF MICHIGAN
 2                        SOUTHERN DIVISION

 3

 4   ROBERT DAVIS and
     D. ETTA WILCOXON,
 5
         Plaintiffs,
 6

 7   -v-                                    Case No. 17-cv-11742

 8

     DETROIT DOWNTOWN DEVELOPMENT
 9   AUTHORITY and DETROIT BROWNFIELD
     REDEVELOPMENT AUTHORITY,
10
         Defendants.
11   _____/

12

13                  PLAINTIFFS' EMERGENCY MOTION
                   FOR TEMPORARY RESTRAINING ORDER
14                    OR PRELIMINARY INJUNCTION

15              BEFORE HONORABLE MARK A. GOLDSMITH

16           Detroit, Michigan, Tuesday, June 6th, 2017.

17

     APPEARANCES:
18
     FOR THE PLAINTIFFS:        ANDREW A. PATERSON, JR.
19                              42350 Grand River Avenue
                                Novi, MI 48374
20

21   FOR THE DEFENDANTS:        DENNIS K. EGAN
                                400 Renaissance Center
22                              Suite 3400
                                Detroit, MI 48234
23

24   David B. Yarbrough, CSR, FCRR
     Official Court Reporter
25   (313) 410-7000
```

TABLE OF CONTENTS

PAGE

WITNESSES:

NONE

EXHIBITS

NONE

```
 1          Detroit, Michigan.

 2          Tuesday, June 6th, 2017.

 3          At or about 1:53 p.m.

 4                    --    ---    --

 5          THE CLERK OF THE COURT:  Please rise.  The United

 6  States District Court for the Eastern district of Michigan is

 7  now in session, the Honorable Mark Goldsmith presiding.  You

 8  you may be seated.

 9          The Court calls case number 17-11742, Robert Davis,

10  et al versus Detroit Downtown Development Authority, et al.

11  Counsel, please state your appearances for the record.

12          MR. PATERSON:  Andrew Paterson on behalf of the

13  plaintiffs.

14          MR. EGAN:  Dennis Egan on behalf of the defendants.

15          THE COURT:  All right.  Good afternoon.  We have

16  scheduled this hearing on plaintiff's emergency motion for a

17  temporary restraining order or in the alternative, motion for

18  preliminary injunction.  It's docket number eight.  I'll alert

19  you that we are probably going to get interrupted by a criminal

20  matter that has been previously scheduled that we'll need to

21  take up at some point, but in any case, we'll start with this

22  case now.  Mr. Paterson, you want to lead off?

23          MR. PATERSON:  Thank you and initially I would like

24  to thank the Court for scheduling this matter on such an

25  accelerated schedule.  I appreciate it.  The plaintiffs have
```

1    brought this action in Federal Court seeking the Court to issue

2    I think a preliminary injunction rather than a TRO at this

3    point since we have opposition here enjoining the defendants

4    from proceeding without first obtaining a vote of the

5    electorate, a vote of the plaintiffs as part of the electorate

6    with respect to the changed use in the millages that are being

7    proposed to be utilized by the DDA in its expanded plan in the

8    Brownfield Redevelopment Authority and as part of that plan.

9            The plaintiffs' right to vote I think is fairly

10   clearly a fundamental right that can be enforced under the U.S.

11   Constitution and provides the basis for us appearing in your

12   jurisdiction.  I think the standing issue is also appropriate

13   in and recognized by the Michigan Supreme Court in the South

14   Haven case that we cited giving any taxpayer standing to

15   challenge issues with respect to the use of tax funds.

16           I would first indicate to the Court that the City

17   Council in defendants' brief they filed this morning indicated

18   that they would be adjourning their vote today to June 20th so

19   the timing that we requested when we filed this was with

20   respect to the possible vote by the City Council today.  It is

21   as acknowledged by defendants now been adjourned to the 20th.

22   They did pass some preliminary Brownfield Redevelopment

23   Authority tax abatement and matters of that sort, but the

24   fundamental issues with respect to the capture which has not

25   happened yet of the increased millage, that has not occurred

1    and it's something that will occur over a 30-year period

2    depending on when it initiates.

3          THE COURT:  I want to understand a little bit better

4    how this implicates the right to vote.  I've not had a chance

5    to fully study everything that's been filed so if I miss

6    something, please let me know that, but I'm trying to

7    understand your theory.  As I understand it, you're contending

8    that the defendants are somehow going to be using millage

9    proceeds in a way that is not authorized.

10          MR. PATERSON:  The -- the -- the Michigan Supreme

11    Court case that indicates that the plaintiffs here have a right

12    to vote with respect to the proposed usage in capture of the

13    millage is the South Haven case and in that case, if I can even

14    just read from it briefly, I think the Court lays out why these

15    plaintiffs have a right to vote with respect to that.  I'm then

16    quoting from South Haven v. Van Buren County Board of

17    Commissioners, 478 Mich, 518, 2007 case.  The Michigan Supreme

18    Court indicated and I'll quote it; "Under the General Property

19    Tax Act, MCL 211.1 et seq, when a millage proposal is committed

20    to the electorate for approval, the ballot must fully disclose

21    each local unit of government to which the revenue from the

22    millage will be disbursed and must state" and then in smaller

23    quotes, "a clear statement of the purpose of the millage."

24          "This statute does not expressly preclude using for one

25    purpose tax revenues specifically approved for a different

1   purpose, however a fundamental rule of statutory construction

2   is that the Legislature did not intend do a useless thing.  If

3   funds that voters approved for the purpose stated on the ballot

4   could be redirected to another purpose without seeking new

5   approval, there would be no reason for including the purpose on

6   the ballot.  Indeed, voters would be lulled into voting for a

7   millage for a popular purpose only to have the funds then used

8   for something they may well have never approved.  This is

9   contrary to the General Property Tax Act.  While no court has

10  warrant to violate MCL 224.20b" and that's the statute that was

11  involved in that particular case, ordering distribution is

12  contrary to the statute, "it likewise may not violate 211.24f"

13  which is this, the section that has the ballot have to state

14  the purpose, "by ordering those funds to be used for a purpose

15  not approved by the voter."

16          So I think that's the specific section.  There's no

17  issue today whether these taxes if captured can be used for the

18  TIF purpose that the DDA seeks to utilize them for and the

19  Brownfield Redevelopment seeks to utilize them for.

20          THE COURT:  So is your theory then any time there's a

21  claim that the provisions of some measure that's been adopted

22  by voters has not been complied with, that that implicates the

23  right to vote?

24          MR. PATERSON: The Michigan Supreme Court takes that

25  position.  I am simply echoing their decision.

1          THE COURT:  Well, where do they talk about the right

2     to vote here?  They're saying that it violates Michigan law to

3     use proceeds in a way that is not authorized under that law

4     that was approved by the voters and that makes sense, but where

5     does it say here that that has something to do with the right

6     to vote which is a separate issue?

7          MR. PATERSON:  The defendants are purporting to

8     capture and use funds that were dedicated in the purpose

9     section of the ballot for operating purposes for the schools

10    and for operating purposes for the parks.  They're proposing to

11    use it for something other than that, a different purpose.

12    It's -- that falls specifically into the quotation from the

13    South Haven case, indeed voters could be lulled into voting for

14    a millage for a popular purpose only to have the funds then

15    used for something they may well have never approved, this is

16    contrary to the General Property Tax Act.  While no court has,

17    and they continue on.

18         THE COURT:  No, I heard what you read and I'm reading

19    it now on the screen, but it's another step in the analysis to

20    say that that implicates the right to vote.  The right to vote

21    typically has been litigated in a context of people who are

22    deprived of the right to vote base on invidious reasons; race,

23    religion, ancestry, whatever.  You're making a different kind

24    of argument than that.  It's not that somebody has been

25    deprived of the ability to actually cast a ballot, you're

1    saying that somebody hasn't complied with the law that was

2    adopted and that that therefore contradicts the will of the

3    voters and therefore that violates the right to vote somehow.

4    That's not obvious to me and I would like you to tell me if

5    there's a case that says that when somebody misuses funds or in

6    any way acts contrary to a measure that's been adopted by

7    voters, that that actor has somehow violated the right to vote

8    of those who voted in the election.

9          MR. PATERSON:  I think that the Michigan Supreme

10   Court in the South Haven case recognizes as a fundamental right

11   the right of the voters to seek in this case an injunction

12   commanding the body, the public body that is intending to

13   utilize it in a different manner, to require them to take it to

14   a vote of the voters.  It's a fundamental Michigan right to

15   have public bodies comply with the law.  The South Haven case,

16   I'm reminded by my client does say if they want -- if a public

17   body wants to use it for a different purpose, they must get a

18   vote.

19          THE COURT:  Go ahead.

20          MR. PATERSON:  And no vote has been offered.  The DDA

21   has made no effort.  They've only taken it to the City Council.

22   They want the City Council to approve it and then they would

23   like to sell bonds to reimburse the private money that's been

24   advanced for these 34 and-a-half or 36 million I see now in

25   improvements and they've made no provision whatsoever to permit

1    the electorate to have a vote on the change in the use of the

2    tax revenue generated from the school millage and from the

3    parks millage.

4            THE COURT:  Now there was a response filed by

5    defendants recently.  Did you review that?

6            MR. PATERSON:  Just now.

7            THE COURT:  Do you have any response to the points

8    that the defendants were making?

9            MR. PATERSON:  I do and I'd like to, you know, have

10   an opportunity to look at it a little longer and make more

11   response, but I think it raises a couple issues that really

12   aren't in dispute.  The plaintiffs do not dispute that the DDA

13   and the Brownfield Redevelopment Authority have the authority

14   to capture these taxes.  That's not an issue.  That's clearly

15   permitted under the TIF statute and the exemption for libraries

16   is simply that, that they can't use library funds.  Well, that

17   doesn't mean they can't use school funds.  They can in fact use

18   school millage funds or parks funds, but they first must seek

19   the vote of the electorate approving that different use from

20   what was originally proposed by the electorate or approved by

21   the electorate.

22           THE COURT:  Well, when did this first surface that

23   the funds were going to be used in this fashion?

24           MR. PATERSON:  The proposed amendment to the plan, to

25   the catalyst plan first I think appeared after some

```
 1    negotiations apparently between the two private developers that
 2    are going to utilize the Little Caesar Arena, the Pistons and
 3    the Ilitch organization.  That was in January of this year.
 4              THE COURT:  So that's when it surfaced that these
 5    defendants were going to be utilizing the funds in the manner
 6    that you're objecting to?
 7              MR. PATERSON:  One minute.
 8              (Pause)
 9              MR. PATERSON:  I'm told by my client --
10              THE COURT:  Just a minute.  Just a minute.
11              (Pause)
12              THE COURT:  Go ahead.
13              MR. PATERSON:  I'm not certain, I think it's Exhibit
14    4 or 5, D, Exhibit D which is the DDA minutes from April 19th,
15    2017 approving minutes with respect to the enhanced catalyst
16    plan so that's when it arose.  I think negotiations prior to
17    that were public and I'm aware of them, but it was the DDA in
18    April, and April 19th specifically in their minutes, Exhibit D,
19    as to when they did that.
20              THE COURT:  But you say it was public before that?
21              MR. PATERSON:  The negotiations to do it were public
22    before that.  I don't think the parties, the private parties
23    had reached an agreement until some time shortly before that
24    and maybe even after that, but the DDA took action April 19th.
25              THE COURT:  Okay, go ahead.
```

1          MR. PATERSON:  With respect to the question you asked

2     about the right to vote on these matters, I would like to refer

3     to the South Haven case again where they stated quote "The

4     clear import of MCL 211.24f indicates taxes levied pursuant to

5     a millage proposal may not be spent contrary to the express

6     will of the voters," which I think is a given, and I would add

7     to that that the Revised School Code specifically directs the

8     use of tax levied monies and it says under Section 380.1216,

9     except as provided in the Revised Municipal Finance Act which

10    is really not relevant here as provided in Section 15 of the

11    State School Aid Act or the purposes authorized under 1211(5),

12    money raised by tax shall not be used for a purpose other than

13    that for which it was raised without the consent of a majority

14    of the school electors of the district voting on the question

15    at a regular or special school election and I would indicate

16    that my plaintiff, D. Etta Wilcoxon, is an elector in the city

17    of Detroit which includes the school district and it is her

18    right to vote that is set forth in the Revised School Code that

19    they are purporting to not address or not permit.  Without the

20    consent of a majority of the school electors of the district

21    voting on the question at a regular or special school election,

22    money cannot be used for a purpose other than that for which it

23    was raised and that's precisely what's happening in this

24    particular instance.  That is the right to vote that is being

25    frustrated by the efforts of the DDA to raise the money without

```
 1    getting approval first from the electorate.

 2           THE COURT:  So let me to go back to the question I

 3    asked you earlier then.  So is any action taken by anybody

 4    that's not compliant with a measure adopted by voters an action

 5    that implicates the right to vote under your theory?

 6           MR. PATERSON:  It certainly does under the school

 7    millage because that's specifically what the Michigan Supreme

 8    Court held, that you can't change the purpose for school

 9    millage without a vote of the electorate.

10           THE COURT:  Now you were saying that Ms. Wilcoxon was

11    a voter in that election?

12           MR. PATERSON:  She is.  She is a city of Detroit

13    resident.

14           THE COURT:  What about Mr. Davis?

15           MR. PATERSON:  Mr. Davis is a Wayne County resident

16    in Highland Park.

17           THE COURT:  So did he vote in that election?

18           MR. PATERSON:  He did not vote in the school's

19    election.  He did vote according to his affidavit which I think

20    is Exhibit A in the Brownfield redevelopment millage that was

21    approved in 2012 I believe.

22           THE COURT:  Okay, go ahead.

23           MR. PATERSON:  The capture of these revenues has not

24    occurred, the City Council hasn't acted yet, but I'm seeking

25    here the Court's injunction against the defendants from so
```

1   proceeding until they have first received the approval of the

2   electorate with respect to both the parks millage and the

3   schools millage as required under South Haven, the Michigan

4   Supreme Court and under Michigan General Property Tax Act as

5   well as the Revised School Code.  They're perfectly able to

6   utilize those funds once they receive the approval of the

7   electorate.  This isn't the distinction that they raise in

8   their brief that I think is in a posit, but the library funds

9   for example, if they were seeking to use or capture any

10  increase in millage for library funds, they could not do that.

11  The TIF Act expressly exempts library millage.  It doesn't

12  exempt the school millage.  They are entitled to use it.  They

13  are entitled to capture the parks millage, but they first must

14  under South Haven give a vote to the electorate to approve

15  those usages.

16        THE COURT:  Now there's an argument made in the

17  defense response about irreparable harm and the argument is

18  that it's really a dispute that's resolvable by money if it

19  turns out that the defendants have somehow acquired funds that

20  they are not entitled to under the law, they could be ordered

21  to return the funds.  What's your response to that?

22        MR. PATERSON:  The right to vote has got not a price

23  on it.  It's ir -- I mean, it's a fundamental right under the

24  Constitution and enforceable by the federal court.

25        THE COURT:  Well, those statements are usually made

1    in connection with people who don't get to vote for reasons

2    that are unlawful and when they have been deprived of their

3    right to cast a ballot, there's nothing you can do afterwards

4    that would compensate them for that, but in this case your

5    argument turns on the misuse of funds.  That's eminently

6    solvable with money because if the funds were misused, they

7    should be replaced.  I don't see how that ends up compromising

8    somebody's right to vote if at the end of the day the voter

9    gets exactly what he or she expected would happen, that the

10   funds would not be used in a way that is not authorized under

11   the ballot proposal that was adopted.

12            MR. PATERSON:  I, I understand that argument.  I

13   think it's somewhat disingenuine (sic) because the defense to

14   that argument when I filed the suit to get them to disgorge the

15   money is, well, the electorate could have approved this usage

16   and you didn't have a vote telling us we couldn't spend it that

17   way.  I mean, it doesn't address the right to vote.  The right

18   to vote is so fundamental that it's necessary in order to sell

19   the bonds to buyers that can be assured there would be no

20   disgorgement in a subsequent lawsuit, but I can see the defense

21   in the subsequent lawsuit, well, the voters may have approved

22   it.  They may well approve this one, I don't know.  That's why

23   we have elections.  That's why we vote on propositions.

24            THE COURT:  All right.  Anything else?

25            MR. PATERSON:  The vote can occur in either the

1   August or the November election of this year.  There's still

2   ample time to place it on the ballot.  I also saw that the City

3   Council has delayed its vote to June 20 and I have a right I

4   think to amend my complaint and if it would be, address the

5   concern of the defendants, I could bring the City Council in as

6   an added defendant since they, too, have a role in deciding how

7   TIF money can be captured and used and would have a right --

8   the argument was made and I only had a minute to look at it,

9   but the argument was made that I sued the wrong parties and

10  they said the City Council should be a defendant.  Well, I'm

11  more than happy to add the City Council as a defendant.  They

12  do have a role under TIF and they do, the DDA and Brownfield

13  Redevelopment do need to go to them for their approval for this

14  catalyst project and for the capture and that can easily be

15  done with leave of the Court or under the court rule, I think I

16  probably have that right.

17          The injunction and the language seemed to be somewhat

18  confused to the defendants, but I am seeking the Court's order

19  that they not be allowed to proceed with the project until they

20  first receive voter approval.  That's a fairly straight

21  forward, simple injunctive relief that prevents them from

22  proceeding without considering or taking into account the

23  electorate's vote on the matter.  If the Court has any

24  questions of the form of the remedy, I can certainly be happy

25  to address that and --

```
1            THE COURT:  Not just yet.  Thank you.  Let me hear
2     from Mr. Egan and again I'm going to caution you I may have to
3     interrupt you as soon as I get word that our criminal matter is
4     ready to proceed.
5            MR. EGAN:  Absolutely.  Your Honor, thank you very
6     much for giving us an opportunity.  I apologize for some level
7     of sloppiness in the brief we filed today because we had to get
8     together and wanted to get it to you before 1:30 so we did the
9     very best we could.
10            A couple things have now come up.  It's as if this
11     motion's been written on a dry erase board.  Now they've said
12     because my first point is what injunction do you want?  What's
13     the TRO you seek?  They now want an order of the Court
14     prohibiting the projects from proceeding until there's an
15     election.  That's not a temporary restraining order.  That's
16     not a preliminary injunction.  That's a permanent injunction;
17     after a trial, they win.  They haven't articulated what the TRO
18     which is what we're here for today is going to say.  They
19     haven't provided the order.  You can't get a TRO that gives you
20     your final relief, but now he's saying we want a TRO
21     essentially that prohibits anything from happening until
22     there's a ballot, a ballot proposal.  That's not a TRO.
23            Secondly, he keeps coming back to the South Haven
24     case which by the way didn't deal with capture issues.  You
25     know, I live in Troy.  They had a bond issue to put wireless in
```

1    all the schools.  Well, once you do a bond issue for wireless

2    in the schools, I understand you can't use it then to buy

3    buses.  That's what the South Haven case is talking about.

4    South Haven didn't deal with capture issues where the

5    Legislature as we laid out in our brief has set out a scheme

6    where entities like my clients are able to capture portions of

7    tax revenue for projects that the Legislature has decided are

8    in the public good and the public interest.  As is pointed out

9    in the brief, the Pistons coming downtown alone is going put at

10   least four million dollars of additional income tax revenue

11   into the city of Detroit because the players get taxed.  That's

12   a benefit to the citizens of the city of Detroit.  They do not

13   explain, umm, so as I said, we have their wanting this TRO in

14   place, but there's no justification for this TRO to be shown.

15        Now they keep talking about the right to vote is

16   fundamental and what I was getting to the South Haven case in a

17   way proves our point.  There's a remedy under state law if they

18   want to sue to say as the plaintiffs did in the South Haven

19   case the millage revenue was misapplied, but it's not a 1983

20   claim and it's not a denial of the right to vote.  These

21   plaintiffs voted.  What they're unhappy about is what happens

22   after the votes were counted and what the taxing authorities

23   did with the money after the ballot was approved.  I couldn't

24   find any case suggesting that it's a denial of a right to vote

25   when you're unhappy with what a school board for example does

1    with tax revenue after a millage is passed.  There is no --

2    they have to show a likelihood of success on the merits and the

3    South Haven case doesn't deal with 1983 --

4         THE COURT:  Isn't there some remedy for the Michigan

5    Attorney General to bring an action if there's a misuse of the

6    funds?

7         MR. EGAN:  Absolutely.  Absolutely.  The point is

8    there's remedies.  They're really talking not about denial of

9    the right to vote, they're talking about issues we've got a DDA

10   statute, we have a Brownfield statute, we have a school code.

11   The Legislature has enacted all of these statutes and as we

12   indicated in our brief, the Tax Injunction Act suggests that

13   it's not the province of the federal courts to interfere with

14   that system of state taxation, that that's an issue for the

15   states to decide.  Now what they're basically by dressing this

16   up as a right to vote issue, they're trying to federalize and

17   have this Court start supervising the Legislature's

18   comprehensive scheme where the Legislature made the decision

19   that DDAs can capture revenue from school districts or park

20   districts.  The Legislature decided they can't do it for

21   millages that are intended solely for libraries.

22        The Legislature is setting the ground rules.  They're

23   unhappy with the Legislature's ground rules.  It has nothing do

24   with the right to vote.  If they want to file an action in

25   Wayne County Circuit Court claiming that this money has been

1    allocated improperly, they're free to do so.

2          THE COURT:  All right.  I'm going to have to

3    interrupt you because we do need to take up our criminal matter

4    now, so I'll ask the attorneys if they will please vacate the

5    tables and we'll be adjourned in this matter.  We'll resume as

6    soon as our criminal matter's completed.

7          (Matter adjourned at 2:27 p.m.)

8          (Matter recalled at 3:58 p.m.)

9          THE CLERK OF THE COURT:  Please rise.  Court is back

10   in session.  You may be seated.  The Court recalls case number

11   17-11742, Davis, et al versus Detroit Downtown Development

12   Authority, et al.

13         MR. EGAN:  Your Honor, it's been a long afternoon so

14   I'm going to try to brief 'cause I think most of the issues in

15   our brief the Court has hit either in questions to Mr. Paterson

16   or I've been able to address them.  Couple of things.  I want

17   to correct a partial misstatement.  I mentioned that public

18   libraries are exempt from this type of financing by the

19   Legislature.  I'm here with Rebecca Navin who is the in-house

20   counsel with the DDA.  She tells me under certain circumstances

21   they are, but for example the Legislature has specifically

22   exempted the Detroit Institute of Arts and Detroit Zoo from

23   capture under the TIF program.

24         Number two, you asked the question when did they

25   first become aware of this project, this situation.

1  Mr. Paterson's first answer was January, 2017, but then they

2  shift to some minutes from April, 2017, but that wasn't the

3  Court's question.  The question was when did they first become

4  aware of this project.  Ms. Navin tells me that the project was

5  actually announced in November of 2016 and Mr. Davis and Mr.,

6  using Mr. Paterson as counsel filed a lawsuit against the DDA

7  under the Open Meetings Act relating to this project, so

8  they've known about it at least since December.  Mr. Paterson

9  said January.  Here we are six months later and there's

10 suddenly an emergency that required this Court to pick this up

11 immediately.

12        Mr. Paterson also made the statement that there was

13 an adjournment by the City Council of some scheduled action.

14 That's not quite correct.  On May 25th, Detroit City Council

15 schedule two matters for consideration.  One was today had to

16 do with the Brownfield proposals and on June 20th for the DDA

17 proposals.  The Brownfield one was approved today, nothing's

18 been adjourned.  The DDA one has always been on June 20th

19 because of a time limit requirement in the statute as to how

20 long that has to be given before it can be acted on.

21        Like I said, we've hit the irreparable harm.  On page

22 33 of their brief, they wanted the Court to enjoin the spending

23 of money.  That clearly shows that there's not irreparable

24 harm.  There's certainly no immediate harm in that nothing's

25 about to happen, this can be dealt with on a more ordinary

1    course because nothing is about to happen today, tomorrow or

2    thereafter.

3            THE COURT:  Give me the time table.  How long does it

4    take for money to get spent?

5            MR. EGAN:  I think it depends on the project.  The,

6    umm, my understanding is it depends on the project and what the

7    bonds are for.  For example, the Pistons thing is obviously not

8    as far along as the arena.  For example, I just saw last week

9    they're in the process of building out the locker room for the

10   Pistons, but see, the Pistons finance this, they actually pay

11   for this.  They're then reimbursed, so money that would be

12   approved now, when might it actually be disbursed?  Do you

13   know?

14           MS. NAVIN:  When the bonds are issued which would be

15   we hope in July.

16           MR. EGAN:  It'd be when the bonds are issued which we

17   would hope would be July.  So that's when money -- that's when

18   they can then start reimbursing.

19           THE COURT:  Now if plaintiffs were right and if it's

20   ultimately determined that the defendants somehow have

21   wrongfully used this money, is there any bar to an order

22   requiring the money to be paid back by the defendants?

23           MR. EGAN:  Well, the question is by what court?  As

24   we've cited the federal courts, number one, this is solely an

25   action for injunctive relief.  That's all they've filed right

```
1    now.  This is not an action for damages and the complaint

2    doesn't even come out and say that that's what they're asking

3    this Court to do.  I think they want it held up while there's

4    going to be some kind of ballot, but they haven't talked about

5    anything about having to repay and for the reasons we stated in

6    our brief, that doesn't have anything to do with a right to

7    vote, that has to do with an interpretation of the taxing

8    statutes.

9              THE COURT:  No, I understand all of that.  I want to

10   know if plaintiffs are right that this is somehow wrongful,

11   whether it's in this court, whether it's in the state court, is

12   there some court that can order that the money be repaid?

13             MR. EGAN:  I presume as the Court said, the best

14   example if the Attorney General wanted to bring an action, the

15   logical choice and have money be repaid, the Attorney General

16   certainly has the power and supervises this kind of thing so I

17   think the answer is yes, by the Attorney General.  You also

18   have a more fundamental issue because if they're right, the

19   entire millage is theoretically invalid so are you going to

20   start going into also the school portions of it, the park

21   portion of it because I don't think you can just so nicely say

22   well because there was an alleged misstatement on the ballot,

23   this little portion of it is not okay, but the rest of it is,

24   so there's at least an argument that they're opening a can of

25   worms as to whether the Court would have to invalidate the
```

1   entire bond issues covered by these elections.

2        THE COURT:  Go ahead.

3        MR. EGAN:  Did that answer the question?  I did the

4   best I could.  As I said, we haven't had a chance to get as

5   deeply into this as we might have, again because of the quote

6   "emergency" that was urged on everyone that this needed to be

7   dealt with today.

8        I think ultimately the real issue is their right to

9   vote has not been infringed.  This case doesn't have to do with

10  the right to vote.  That is a, makes it a federal issue.  This

11  is an issue of state law for the Attorney General, the state

12  courts and the rest to deal with and there's simply no basis

13  for them to have the federal courts insert themselves into not

14  the election, it's not that people were prevented from voting

15  or ballots were shredded before they were counted.  As we said

16  and we cite in our case, garden variety irregularities with a

17  ballot don't even come under federal Constitutional protection.

18  This isn't a challenge to the right to vote.  They in fact

19  voted.  They weren't -- there wasn't a secret ballot.  There

20  wasn't something done.  What's done here is plain and simple,

21  they're not happy with what the taxing authority did after the

22  millage went through and that's not a subject of a right to

23  vote and they're casting it that way because, you know,

24  Mr. Davis has brought so many cases in Wayne County, he now has

25  to post a bond before he files a case, okay, let's go over to

```
1    federal court.  He's already sued DDA over this project
2    regarding the Open Meetings Acts and I get back to the laches.
3    If they're aware of this in January, where have they been the
4    last six months?  But now yesterday there's an emergency that
5    requires the immediate intervention of this Court so we're
6    having to respond to this with basically hours after they filed
7    their motion rather than the more orderly 14-day process that
8    this Court normally finds for motions.  So I think we've
9    covered it unless you've got another question, umm --
10              THE COURT:  Not right now.
11              MR. EGAN:  I miss anything?
12              MS. NAVIN:  (Shaking head)
13              MR. EGAN:  Okay.  Thank you very much, your Honor.
14              THE COURT:  Thank you.  Mr. Paterson, you want to
15   respond?
16              MR. PATERSON:  Yes, I do.  Money raised by tax shall
17   not be used for a purpose other than that for which it was
18   raised without the consent of a majority of the school electors
19   of the district voting on the question at a regular or special
20   school election.  How is that not a right to vote?  That's
21   where I'm coming from on this case.  We're not seeking a refund
22   or anything of the sort, we want the right to vote.  That's all
23   this case is about is the plaintiff Wilcoxon's, as an elector
24   of the district, her right to vote.
25              Let me clarify a couple things for the record.  The
```

1   preliminary injunction, TRO that we seek is against the capture

2   of the tax money received through the levy that was voted upon

3   for school purposes.  Before they can capture that, with --

4   shall not be used for a purpose other than that for which it

5   was raised without the consent of a majority of the school

6   electors.  That's the right that is at issue in this case and

7   the injunction that we seek is don't use that money until

8   you've had a vote of the electorate approving its use.  That's

9   the narrowness of it.  We're not trying to stop the project,

10  the 18 mill school millage operating revenue and the Wayne

11  County parks millage.  We're not trying to stop any of those

12  projects.

13          There is no irreparable harm.  As counsel indicated,

14  the private parties are advancing these funds.  This millage is

15  strictly proposed for a reimbursement of those costs.  There's

16  nothing urgent about the reimbursement since the money's being

17  spent today and there's no accounting of that.  At the

18  earliest, counsel indicates perhaps July of this year.  Well,

19  if it's October, then it's October, but we have an August

20  primary and we have a November primary at which these

21  defendants can act with the consent of a majority of the school

22  electors.  Electors, school electors that have approved a

23  school operating millage and they want to propose and it's

24  perfectly legitimate for them to propose capturing some of that

25  millage and using it for the purposes that they intend to use

1     it for, but they can't do it in the words of the statute,

2     380.1216 of the Michigan Revised School Code, money raised by

3     the tax shall not be used for purpose other than that for which

4     it was raised without the consent of a majority of the school

5     electors of the district voting on a question at a regular or

6     special school election.  That's what we're seeking.  We're

7     trying to enforce that.  The -- that's Ms. Wilcoxon's case.

8          Mr. Davis has raised the issue himself with respect

9     to the Brownfield vote and the parks, the Wayne County parks

10    millage which was the 2016 election that I see from the recess

11    and he's trying to follow the South Haven case which was the

12    Michigan Supreme Court that said that public bodies can't use

13    millages raised, capture millages raised for a different

14    purpose without a vote of the people.  That's the Michigan

15    Supreme Court's interpretation of the General Property Tax Act.

16    That's their understanding and how they read that using

17    statutory construction.  So that applies as well to the school

18    tax, but specifically the Revised School Code applies to the

19    school tax as well, so the authority rests in the General

20    Property Tax Act and in the Revised School Code as interpreted

21    by the state's highest court and it indicates in both cases

22    that the electorate is entitled to a vote before that money can

23    be captured, before that money can be used for a different

24    purpose.  That's all that the plaintiffs are seeking here is

25    the right to vote and to seek the electorate's approval of this

1    change in use and change in purpose of the millage.  The

2    project isn't going to stop.  No one's trying to stop the

3    project.  The project's a wonderful project.  Everybody's

4    endorsed that project and the electorate should have that

5    opportunity as well.

6            She's -- plaintiff Wilcoxon is simply seeking to

7    exercise her fundamental right to vote on the question of

8    whether the defendants should be permitted to capture the tax,

9    the tax that was voted for school operating purposes, the 18

10   Detroit Public School, 18 mill vote and now they're proposing

11   to use it for a different purpose.  Plaintiff wishes to vote on

12   it.  Section 380 of the -- 388.1615 of the Revised School Code

13   and the Michigan General Property Tax Act, 211.24f, as

14   interpreted by the Michigan Supreme Court in South Haven

15   clearly indicates that she as part of the electorate and

16   Mr. Davis as part of the electorate have a right to vote on

17   before this may be used.  The language is shall not be used

18   without the consent of a majority so that it seems clear that

19   the vote needs to come before they're entitled to use the

20   millage so the extent of the TRO and preliminary injunction

21   would be to enjoin them from using for a different purpose any

22   millages and not capturing them without first obtaining the

23   vote of the plaintiff and the rest of the electorate.

24           The parks millage rests not on the school code

25   because it's the parks millage, it rests on the General

 1    Property Tax Act 211.24f and the Court's interpretation of

 2    South Haven which I think I read to you earlier that the

 3    taxpayers can be lulled into approving a project that they

 4    support and then the public body if it turned around and used

 5    it differently would be a violation of what was approved in the

 6    purpose of 24f putting the purpose of the tax into the ballot

 7    and that's where we seek to enforce that in the, in the

 8    Brownfield case.

 9             The right to vote is the issue.  It's -- there's no

10    remedy.  We're not seeking tax refunds or anything of that

11    sort, it's the right to vote.  That's solely what this case is

12    about.  It is not seeking to have the money refunded.  The

13    money was voted in.  The plaintiff voted in favor of the school

14    operating millage.  This is strictly a proposal to change the

15    use of that and she just wants that right to vote.  She doesn't

16    want a refund.  That's not what this case is about.  That's

17    just misdirection that really doesn't address the right to

18    vote.

19             The case as it stands, I guess I agree with counsel,

20    the urgency and I appreciate the Court having scheduled this,

21    but I also see that and I'd like a chance to respond to the

22    brief that was filed in response to our motion and give the

23    Court an opportunity to consider those issues raised by them in

24    that brief.  I would also like the opportunity to add the City

25    Council as a defendant and perhaps the City since I see that in

1    their brief that they've raised maybe these aren't the right

2    parties.  I think they are because they are the ones that are

3    attempting to utilize and capture the tax funds that were

4    levied by the millages, but if I need to add to complete the

5    parties that have a role in this, I can add the City Council.

6    I'd be happy to do that almost immediately.  I also would like

7    the opportunity to review in some detail and address the

8    arguments raised in the defendant's brief.  The Court has any

9    questions?

10             THE COURT:  What is your view as to when the right to

11   vote is actually going to be infringed on?

12             MR. PATERSON:  If the City Council proposes to

13   approve the catalyst project and attempt to sell bonds pursuant

14   to that without a vote of the people, I think then the people's

15   right to vote has been infringed upon, upon the approval by the

16   City Council without scheduling first a vote.  I don't know how

17   they can sell the bond when it's going to violate Michigan law,

18   but that's where I'm anticipating --

19             THE COURT:  Is that when it happens, when they sell

20   the bonds?  When they approve it before hand?

21             MR. PATERSON:  Well, the approval will enact the

22   capture I believe, your Honor, and that's what I think the City

23   Council determines is that we can capture this millage, in this

24   case the school operating millage, the Wayne County parks

25   millage.  That resolution purports to capture that money so

1    that they have a basis for then selling the bonds.  I believe

2    that's how the bond sale works.  At that point, once they sell

3    the bond, they've got a contract through the bond with the

4    buyer of the bond and they've said we've dedicated this

5    revenue.  At that point they're in a box because if this is

6    truly illegal because they didn't receive the vote of the

7    people, they have a problem I think with their bond buyer at

8    that point, but that's why it's urgent.  We've got an August

9    primary.  There's time to put anything on the ballot at this

10   point in time.  November if they're wanting to do that instead,

11   that's their decision.  We're not purporting to say put us on

12   the August ballot.

13            THE COURT:  Well, I'm trying to find out what is the

14   operative date under your theory.  Is it when they sell the

15   bonds?

16            MR. PATERSON:  No, I think it's when they resolve to

17   capture the revenue.

18            THE COURT:  When they resolve to capture?

19            MR. PATERSON:  When the City Council passes a

20   resolution approving the catalyst expansion plan capturing the

21   school operating millage and the parks' millage.

22            THE COURT:  Well, I heard one approval took place

23   today.  There's another approval scheduled to be voted on on

24   June 20?

25            MR. PATERSON:  Yeah.  The approval today as I

1    understand it with respect to the Wayne County parks with the

2    redevelopment authority didn't capture the parks' millage

3    today.  I think today was a tax abatement, rezoning issues of

4    that nature.  I believe that the June 20th hearing is where

5    they will make the attempt to capture.

6            THE COURT:  So in your view, June 20 is the operative

7    date?

8            MR. PATERSON:  I believe it is because -- well,

9    whenever the effective resolution, if they adopt a resolution,

10   I'm not quite sure when it might become effective.  Sometimes

11   legislation has a delay before it's effective, but I think

12   that's the significant event for capturing the millages.

13           THE COURT:  Okay.  Anything else?

14           MR. PATERSON:  No.

15           MR. EGAN:  A couple quick points.  I've been doing

16   this for a few years.  A TRO I understand lasts until you have

17   a preliminary injunction hearing.  A preliminary injunction

18   lasts until you have a trial.  He once again just asked the

19   Court to enjoin the capture of revenue until an election is

20   held.  We are entitled to have a trial on that issue before

21   that issue which is a permanent injunction is addressed.  This

22   is supposedly a TRO.

23           Now he wants time to respond to our brief.  Your

24   Honor, we didn't ask that this be done on an emergency basis.

25   Normally they could have filed a motion for a preliminary

1    injunction, the Court would have set a briefing schedule, we

2    would have filed the brief next week or the week after and then

3    they get to do a reply brief.  Well now that we've filed,

4    stayed up all night and early morning to get this thing out,

5    now they want to respond so there really wasn't an emergency

6    and now they want to respond.

7            It's again a dry erase board.  It depends whatever

8    they wish to say.  He says an injunction, they want us to be

9    enjoined from capturing revenue.  We have been capturing

10   revenue for 40 years using this method of financing.  That

11   whole Little Caesars Arena, you're talking 250 million dollars

12   of bonds in 2014 done this same way.  All that happened is the

13   Legislature's agreed to extend it for another six years, that

14   same program, but this isn't anything new.  The DDA has been

15   capturing revenue for the purpose of this arena since 2014 and

16   for other projects before that.  Where were they?  To come in

17   and now they want us to stop and there's the obvious question,

18   if we can't capture revenue, well there's bonds that have

19   already been issued in connection with Little Caesars Arena so

20   we can't capture revenue not only for this new project, but how

21   will the entities pay the debt service on the bonds that have

22   already been issued which leads us to another issue they've

23   neatly avoided.  Under Rule 65 if you get an injunction, you

24   can be required to post a bond.  Well, the bond to shut these

25   projects down which essentially is what they're doing 'cause we

```
 1    no longer have revenue would be millions of dollars and I doubt
 2    that Mr. Davis and Ms. Wilcoxon have the financial wherewithal.
 3    So for them in a lot of ways this is a bit of a game and it's
 4    semantics, not a right to vote.  For us, it's real business.
 5    We have projects that are underway to benefit the city.  We are
 6    proceeding with those projects for the benefit and they can't
 7    keep changing around what they're asking the Court to do.
 8    They're clearly asking the Court to issue a permanent
 9    injunction 24 hours after the lawsuit was ordered.  I think the
10    Court should just deny the whole thing, set up a preliminary
11    injunction hearing if you wish and let everybody brief.  We can
12    get witnesses, affidavits and, but we're entitled to a trial if
13    they're going to actually try to hold this up until there's an
14    actual election.
15              THE COURT:  Well, what would there be to try here?
16    Are these just legal issues about what does the legislation say
17    and what does the ballot proposal say or are there factual
18    issues?
19              MR. EGAN:  There's a lot of factual issues because
20    opinions were obtained in connection with the financing, what's
21    done, what date, how it works, what the pieces are.  This is
22    extremely complicated and again it's not the right to vote.
23    They voted.  They're asking the federal courts to supervise
24    municipal finance in the state of Michigan because they're
25    unhappy with what taxing entities did with the money and the
```

1     courts are clear that's not the federal court's job, it's the

2     state court's job.

3              There's not a 1983 issue here.  They were allowed to

4     vote.  What they would have this Court do is start supervising

5     every time a DDA and there's a lot of them in this state, the

6     federal courts are going to start supervising how they spend

7     their money and where they get their recapture from and the

8     quality of the ballot proposals.  That's a very rough slippery

9     slope.

10             This isn't about the right to vote.  They haven't

11    given us one case that says a 1983 claim is implicated here.

12    It's not there and your Honor, it's simply not appropriate to

13    issue injunctive relief.  We'll deal with the rest of this

14    lawsuit including the final relief in the ordinary course after

15    we file motions to dismiss and the like, but the emergency

16    relief they ask for today is simply not called for.

17             THE COURT:  All right.  Mr. Egan, you prepared your

18    response on a very short time schedule.  Was there something

19    more you wanted to say in writing?

20             MR. EGAN:  Your Honor, there's a lot more issues.

21    We -- as you see we didn't even get affidavits -- excuse me.

22    We didn't even have time to get affidavits for the underlying

23    facts.  The client has files.  There is bond opinions on this.

24    We haven't gone through the statutory provisions.  There's a

25    lot of law and facts that we simply couldn't do considering the

1    motion was filed after hours last night.  We just didn't have

2    time.  There's a lot more we would like to brief and address

3    with the Court.

4         THE COURT:  What's the earliest bonds will be sold?

5    You mentioned July as a time frame?  Do you have a more

6    definite date within that month?

7         MR. EGAN:  Your Honor, we have a sizeable debt

8    service payment due July 15th, so -- July 1st, excuse me, and

9    the fact is this effects all the bonds, not just necessarily

10   the ones they're talking about if they get this type of

11   injunction which I still think is not needed at this point, but

12   July 1st is certainly a key date.  Is that a fair statement?

13        UNIDENTIFIED SPEAKER:  Um-hmm.

14        THE COURT:  All right.  Well, we have a very busy

15   schedule and I think what I can do is set this up for a hearing

16   on Friday, June 16th.

17        MR. EGAN:  Your Honor, I understand Ms. Navin is not

18   going to be here and actually I won't be here either.  Is there

19   anything chance of having it any later?  Plus I know

20   Mr. Paterson --

21        THE COURT:  I can make it earlier.

22        MR. EGAN:  We want to file another brief.

23        THE COURT:  I know.  I was going to give you until

24   the 13th to file it.

25        MR. EGAN:  But can we at least have the hearing on a

1    later date?

2          MR. PATERSON:  Your Honor, would this be an

3    evidentiary hearing?

4          THE COURT:  I don't know.  I want to see what

5    Mr. Egan files.  All right.  Well, can you get me your brief

6    before the 13th?

7          MR. EGAN:  I think that's going to be difficult.

8    That's basically a week.

9          THE COURT:  Um-hmm.  Well, I can squeeze you in on

10   the 19th I believe.  That would be Monday the 19th.

11         MR. EGAN:  Your Honor, that really doesn't help us

12   with the brief.  We've got quite a bit to do on this because

13   this started yesterday.  They've known about this for six

14   months.  They filed now and now we're all jammed up including

15   the Court and I appreciate what the Court's saying, but I'd at

16   least like to get two weeks to brief this.  On a normal motion

17   you get two weeks and if they would have filed this two weeks

18   ago, we wouldn't be having this discussion, but they waited and

19   I'll do obviously what the Court wants, but --

20         THE COURT:  Well, tell me how many affidavits do you

21   think you need and what are they going to cover?

22         MR. EGAN:  I don't really know because we haven't

23   gotten deeply enough into this because this motion was filed

24   last night, the lawsuit was filed literally yesterday morning

25   and I really don't know.  I know we want to talk -- we need to

1   investigate basically the legal basis of this offering.  I know

2   there were opinions from Council.  There's a lot of facts

3   regarding this and we literally couldn't get that process

4   really started for today.  As I said, they've been sitting on

5   this for a long time.  I'd like to get some time to respond.

6   They've been planning this for quite awhile.

7          THE COURT:  Well, I'm going to have the hearing on

8   the 19th and I will give you until the 14th to give me your

9   response beyond what you've already given me.  I assume this is

10  going to be a supplement of some kind?  You're not going to

11  cover the same ground?

12         MR. EGAN:  Actually I think we're going to probably

13  redo it as if we had covered --

14         THE COURT:  Okay.

15         MR. EGAN:  -- so that it's comprehensive.

16         THE COURT:  All right, then that's fine.

17         MR. EGAN:  That way you don't have to look at two

18  different documents.

19         THE COURT:  That's fine.  All right, so your new

20  response will be due by the 14th and I'll set this up for a

21  hearing on the 19th.  Now I'm going to set the hearing for 9:00

22  on the 19th, but I will tell you that we have a trial scheduled

23  the week of the 12th which I am told is going to go and I will

24  let everybody know by noon on the 16th whether that day,

25  whether that time is going to change on the 19th.  I may push

```
1    you into the afternoon so just keep that whole day available.

2    We'll also let you know whether we think we need to hear

3    testimony on the 19th.  Okay.  What else?  Anything else?

4              MR. PATERSON:  Your Honor, may -- the plaintiffs

5    would like the opportunity to file a response to their brief or

6    a reply to their brief.  I believe it can be done by the 16th

7    although I realize that's a Friday.

8              THE COURT:  Well, I'll need it by 5:00 p.m. on the

9    15th.

10             MR. PATERSON:  15th?

11             THE COURT:  5:00 p.m. on the 15th.  All right and

12   plaintiff went overboard on the pages.  We have a 25-page limit

13   so as far as the response goes, whatever the new defense

14   response will be, that will be limited to 30 pages and the

15   reply is going to be limited to 10 pages.  Don't file anything

16   beyond the page limits allowed by the court rules.  Without

17   getting an order from me in the future, I'm just going to be

18   striking things.

19             MR. PATERSON:  Apologize, your Honor.

20             THE COURT:  All right.  Anything else?

21             MR. EGAN:  No, your Honor.  Thank you very much.

22             THE COURT:  Okay.  That concludes our hearing.

23             (Hearing concluded at 4:39 p.m.)

24                        --    ---    --

25
```

1                     C E R T I F I C A T E

2

3

4

5

6

7           I, David B. Yarbrough, Official Court

8    Reporter, do hereby certify that the foregoing pages

9    comprise a true and accurate transcript of the

10   proceedings taken by me in this matter on Tuesday, June

11   6th, 2017.

12

13

14

15

16   6/8/2017                  /s/ David B. Yarbrough

17   Date                      David B. Yarbrough,
                               (CSR, RPR, FCRR, RMR)
18                             231 W. Lafayette Blvd.
                               Detroit, MI  48226
19

20

21

22

23

24

25